**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MICHAEL PRESCOTT** | **CIVIL ACTION** |
| **VERSUS** | **NO:**     **13-5984** |
| **BOARD OF SUPERVISORS OF THE** | **UNITED STATES MAGISTRATE JUDGE** |
| **UNIVERSITY OF LOUISIANA SYSTEM** | **KAREN WELLS ROBY** |

## ORDER & REASONS

Before the Court is a **Motion for Summary Judgment (R. Doc. 21)** filed by Defendant, the Board of Supervisors of the University of Louisiana System ("Board"), seeking summary judgment pursuant to Federal Rule of Civil Procedure 56, dismissing Plaintiff, Michael Prescott's Title VII, 42 U.S.C. § 2000e, *et seq.*, claims. *See* R. Doc. 21. The motion is opposed. *See* R. Doc. 30. It was heard on the briefs on August 13, 2014. *See* R. Doc. 28.

## I.    Background

### A.    Summary

Prescott, a white male, filed this lawsuit against his former employer the Board of Supervisors of Southeastern University[1] ("Board") a part of the of Louisiana System, pursuant to Title VII of the Civil Rights Act, 42 U.S.C. 2000e ("Title VII"), for the alleged reverse racial discrimination he experienced when he was investigated and ultimately terminated after complaining about an African American subordinate, Angela Jones. *See* R. Doc. 1. Prescott

---

[1] Southeastern University was founded in the 1920's and is located in Hammond, Louisiana and is the state's third-largest public university with over 15,000 students and more than 60 degree programs. Southeastern Louisiana University (Sept. 24, 2014, 4:30 PM), http://www.southeastern.edu/about/index.html

alleges that he was ultimately labeled a racist due to his attempts to manage Angela Jones, an "out of control" employee. *See id*. Prescott alleges that Angela Jones repeatedly made false allegations against him and despite these allegations he was told that he had no authority to discipline her. *See id.* Rather, Prescott alleges that he was investigated and later terminated, which he suggests is the result of racially based favoritism. *See id.* Prescott alleges that Jones was insubordinate and also lodged false allegations against him regarding threats of harm he allegedly made in response to the complaints he made about her non-compliance with policy. *See id.*

### B.      Factual Background

Prescott, after retiring from the Jefferson Parish Sheriff's Office, was hired by Southeastern Louisiana University ("SLU") as a police officer in November 2003. *See* R. Doc. 30-3, p. 1. In 2005, Prescott was promoted to Director of the SLU Police Department, which is an unclassified at-will position. *Id*.

As Director of the SLU Police Department, Prescott's trusted administrative assistant was Brandi Rogers, a white female. Rogers was responsible for managing the payroll for the police department. In 2009, during a routine legislative audit, the auditor found that the university failed to comply with the overtime payroll policy because Rogers had accumulated excessive amounts of overtime. *See* R. Doc. 30-9, p. 5. As a result of the audit, Prescott was advised by Vice President of Student Affairs Dr. Marvin Yates, an African American male, that he should no longer allow Rogers to handle the department's payroll. *See* R. Doc. 21-3 (Prescott Dep. 21:17-22:11, June 3, 2014).

Following the audit, the police department's payroll was designated to an individual in the department to handle on a full time basis. *See* R. Doc. 21-3 (Prescott Dep. 17:9-16, June 3, 2014). The police department had difficulty retaining an employee to do payroll. *See id.* (Prescott Dep. 17:18-21:10, June 3, 2014). In 2011, with the approval of Dr. Yates, Prescott reassigned the payroll to Rogers, his administrative assistant. *See id.* (Prescott Dep. 22:16-23:16, June 3, 2014). Dr. Yates instructed Prescott that Rogers was not to do her own payroll. *See id.* (Prescott Dep. 23:14-16, June 3, 2014).

In the fall of 2011, Angela Jones, an African American female, was a parking guard in the SLU Police Department. Jones applied for a Police Officer 1-A position within the parking division, but was not originally selected by Prescott. *See* R. Doc. 30-3, p. 6. A hiring board appointed by Prescott and consisting of five Police Department employees reviewed the five applicants for the Police Officer 1-A position and agreed to offer the position to Donald Freeman, a white male with 15 years of law enforcement experience. *Id.* at 7.

The day after learning she did not get the job, Jones filed a grievance alleging she was not promoted due to her race, African American.[2] *See* R. Doc. 30-9. p. 14. After receiving Jones' grievance, Prescott met with the university's Director of Human Resources, Kevin Brady, also a white male, to discuss Jones' grievance. *See* R. Doc. 21-6, pp. 1-2. Brady recommended that Jones be promoted to resolve the grievance and also as a result of the affirmative action statistics within the Police Department. *Id.*

---

[2] Jones had previously applied for and been selected for a similar position prior to applying for the Police Officer 1-A position. Jones had also been investigated for an altercation with Sgt. Chris Durham, a white male (R. Doc. 30-9, p. 22), and received verbal warnings for abandoning her assigned work area during a football game without permission (R. Doc. 30-10, p. 8).

Thereafter, seemingly unsatisfied, Prescott met with Dr. Yates, an African American male, and the university's EEOC officer, Gene Pregeant, a white male.[3] *See* R. Doc. 21-3 (Prescott Dep. 85:10-25, June 3, 2014). Dr. Yates and Pregeant also recommended that Prescott promote Jones. *Id.* at 86. Prescott suggests that the decision to promote Jones, the African American female, to the Police Officer 1-A position was really made by Dr. Yates, the African American male.[4] *Id.*

While the grievance process was occurring for Jones, Freeman decided to decline the position because the salary offered was less than he earned at his previous job. *See* R. Doc. 21-6, p. 2. In response to Freeman's decision and in an effort to be a team a player, Prescott sent an email to Human Resources indicating that he wanted to offer the Police Officer 1-A position to Jones because she was his next choice after Freeman. *See* R. Doc. 30-9, p. 20; *see also* R. Doc. 21-3 (Prescott Dep. 82:15-16, June 3, 2014). However, Prescott stated that the position was to be subject to her working initially on a probation period. *See* R. Doc. 30-9, p. 20.

Brady, the Director of Human Resources, advised Prescott that his treatment of Jones was different than his treatment of two other employees who were promoted to permanent promotions without being required to serve in a probationary capacity. *Id.* at 19. As a result, Prescott's request to place Jones on probationary status was denied and Prescott was instructed to hire her as a permanent employee. *See* R. Doc. 21-6, p. 2.

---

[3] SLU's administration is organized in a hierarchal system. At the top is the President Dr. John Crain, then Vice President of Student Affairs Dr. Marvin Yates. *See* R. Doc. 30-19 (Yates Dep. 15:7-13, June 3, 2014). The Director of the Police Department is under the direct supervision of Dr. Yates as the Vice President of Student Affairs. *Id.* The Director of Human Resources, Kevin Brady, is under the direct supervision of the Vice President of Finance. *See* R. Doc. 21-3 (Prescott Dep. 86:18-21, June 3, 2014). Gene Pregeant, the EEOC officer, reports directly to the President. *Id.*

[4] According to Prescott, Jones had refused to become POST certified because it involved weapons training. *See* R. Doc. 21-3(Prescott Dep. 73:5-12, June 3, 2014); R. Doc. 30-32.

After acquiescing in the hiring of Jones, Prescott contends that he was subject to harassment by his subordinate, Jones. He alleges that: (1) the week after she was hired she refused to answer the phone when he called the department; (2) in March 2012 she decided not to come to work; and (3) she left work without prior approval and without calling in sick in violation of policy.

According to Prescott, after Jones was written up for her noncompliance with policy, she lodged a complaint of harassment and retaliation against him and her immediate supervisor Sgt. Kevin Knudsen, also a white male. *See* R. Doc. 30-9, p. 87. Jones thereafter began to complain to different members of the department that she was afraid that Prescott was going to "send his henchmen to flatten her tires," "bomb her car like the Taliban," that she "did not trust Prescott," "that other employees were allowed to take FMLA leave and she wasn't," and that "Prescott was trying to poison her." When Prescott reprimanded Jones for her noncompliance with policy, she routinely filed a grievance. She went so far as to threaten to file a grievance because Sgt. Knudsen hired another white male officer and in her view the department did not have enough minority officers.

In April 2012, Jones filed an EEOC complaint alleging that Prescott harassed her based upon her race. Shortly thereafter, Sgt. Knudsen requested that an investigation be opened to address Jones' allegation that he and Prescott were harassing her. *See* R. Doc. 30-9, p. 89.

On April 7, 2012, Jones under the alter ego of Mimi Templeton emailed Dr. Crain and cc'd Dr. Yates declaring that Brandi Rogers, Prescott's administrative assistant, stole $16,000 from an employee's bank account and did so while at work and using a university computer. *See* R. Doc. 21-3 (Prescott Dep. 137:1-21); *see also* R. Doc. 30-10, p. 39 (email from Mimi

Templeton). In the email, Jones stated that Prescott knew about Rogers theft but refused to take action. Prescott later learned that Mimi Templeton was a character in a novel written by O'Neil DeNoux.

In May 2012, while the challenges continued between Jones and Prescott, and after Dr. Yates received the email from Jones' alter ego Mimi Templeton, Dr. Yates directed his assistant, Rebecca Johnson, to conduct a routine check of the overtime hours for the department's employees. During the routine check she noticed that there were very high overtime hours for the weekends. *See* R. Doc. 21-5. Thereafter Dr. Yates called Prescott to meet with him in his office on May 8, 2012. Prescott later confirmed after reviewing the records that the weekend hours were unusually high such that he described them as "way abundant" and "horrific." *See* R. Doc. 21-3 (Prescott Dep. 30:24-31:3 June 3, 2014). Dr. Yates advised Prescott that he became aware of the overtime hours because his assistant Rebecca Johnson conducted a review of the payroll and noticed the disparity. *See id.* (Prescott Dep. 153:23-25; 154:1-16, June 3, 2014). Prescott thereafter had a departmental investigator review video from the weekend to determine if Rogers actually worked and it was determined that she had not. *See id.* (Prescott Dep. 31:3-9, June 3, 2014).

On May 9, 2012, Jones filed another grievance with Human Resources alleging that since she was promoted Prescott and Sgt. Knudsen were harassing her by repeatedly investigating her, writing her up, and yelling at her in front of students. *See* R. Doc. 30-11, p. 70; *see also* R. Doc. 21-3 (Prescott Dep. 154:18-25, June 3, 2014). Jones filed two additional complaints with the Safety Department and Health Department. *See* R. Doc. 21-3 (Prescott Dep. 155:1-15, June 3, 2014).

An investigation of Jones' complaint was conducted regarding Sgt. Knudsen by Lieutenant Patrick Gipson. *See* R. Doc. 30-10, p. 29. Lt. Gipson concluded that while Jones believed what she was saying, that did not make it true. *Id.* at 36-37. He further concluded that Knudsen had not harassed her and that instead he was simply doing his job. *Id.* at 37. The report made no mention of Prescott.

As a result of Jones' allegations that Prescott was going to kill her, Prescott sent an email on July 12, 2012 to Human Resources Director Brady and cc'd Dr. Yates indicating that he wanted to file a complaint against Jones. *See* R. Doc. 30-13, p. 32. Brady however, responded that he did not think that there was a Violence in the Workplace issue because Jones had not threatened Prescott nor did he think that it was an issue of discrimination against Prescott. *Id.*

While Jones' complaints were being investigated, Dr. Crain, the university's president who was also emailed on the Templeton email, directed the university's auditor to conduct an investigation to determine if Rogers, Prescott's administrative assistant, had committed payroll fraud in light of the preliminary internal audit findings. *See* R. Doc. 21-4, p. 1-2. Rogers resigned immediately after she learned of the audit. *See* R. Doc. 30-13, p. 16.

The audit investigation determined that she had fraudulently claimed overtime using the missed punch process, which allowed her to complete a form requesting additional time and it was determined that Prescott signed blank requests for time. *See* R. Doc. 21-5. In light of the findings, Dr. Crain gave Prescott the option to resign or be terminated because his services were no longer needed. *See* R. Doc. 21-4, p. 2. However, Prescott contends the Board's reason for terminating him was pre-textual. He contends that Jones through her alter ego Mimi Templeton informed Dr. Yates about overtime pay irregularities which involved Rogers but that he didn't

know about and was not involved. Nonetheless, his termination occurred on July 17, 2012 and it was effective July 31, 2012. *See* R. Doc. 30-13, p. 41.

Less than three months after Prescott was terminated, he applied for a Police Officer 2 position in the SLU Police Department and was interviewed for the position but did not receive a job offer. One year later, in October 2013, he applied again for the Police Officer 2 position but his name was removed from the list of persons to be interviewed at the direction of the Human Resources Director. Prescott applied a third time for the permanent Director position, the same position he had been terminated from and he did not receive an interview. Prescott applied one last time for a position with the department for the Police Officer 2 position but yet again he was removed from the list of person to be interviewed.

After filing his EEOC Charge shortly after his termination, Prescott received a right to sue letter from the EEOC on August 27, 2013. *See* R. Doc. 30-11, p. 63. Thereafter he filed the subject action on September 30, 2013 alleging that: (1) the Board negligently permitted an open and notorious hostile work environment based on race; (2) the Board intentionally and/or negligently ignored his well founded complaints against Jones and treated her more favorably because of her race; and (3) the Board terminated him in retaliation for complaining about the discriminatory treatment he received. *See* R. Doc. 2, p. 7-8. Prescott contends that Jones and Dr. Yates conspired together to create a hostile work environment which engulfed the entire police department for over a six month period.

In response to Prescott's complaint, the Board filed the subject motion seeking dismissal of his claims because it had a legitimate, non-discriminatory reason to discharge Prescott that is unrelated to the alleged racial discrimination and retaliation claims. *See* R. Doc. 21-1, p. 2.

Regarding the hostile work environment claim, the Board argues that Prescott cannot prove the claim under objective or subjective standards. *Id.*

## II.    <u>Standard of Review</u>

Summary Judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it would affect the outcome of the suit under the applicable law. *Fiess v. State Farm Lloyds,* 392 F.3d 802, 807 (5th Cir.2004) (citing *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986)).

Where the moving party bears the burden of proof at trial as the plaintiff, or as a defendant asserting an affirmative defense, that party must support its motion with "credible evidence . . . that would entitle it to directed verdict if not controverted at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S. Ct. 2548 (1986). In such a case the moving party must "establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *see also Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.,* 662 F.3d 376, 378 (5th Cir. 2011). Credible evidence may include depositions, documents, affidavits, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c). Moreover, in evaluating a motion for summary judgment by the party with the underlying burden of proof, the Court considers the substantive evidentiary burden of proof that would apply at the trial on the merits. *Anderson,* 477 U.S. at 252. The moving party's burden is therefore "understandably heavier" where that party is the plaintiff. *S. Snow Mfg. Co. v. Snow Wizard Holdings, Inc.,* 829 F. Supp. 2d 437, 447 (E.D. La. 2011).

Once the moving party has made its showing, the burden shifts to the non-moving party to produce evidence that demonstrates the existence of a genuine issue of fact. *Engstrom v. First Nat. Bank of Eagle Lake,* 47 F.3d 1459, 1462 (5th Cir. 1995) (citing *Celotex,* 477 U.S. at 322–24). All justifiable inferences are to be drawn in the non-moving party's favor. *Anderson,* 477 U.S. at 255. However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for Summary Judgment." *Brown v. City of Houston, Tex.,* 337 F.3d 539, 541 (5th Cir. 2003) (internal citations omitted); *see also Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir. 1996) (stating that "mere conclusory allegations" are insufficient to defeat a motion for summary judgment). Though the Court may not evaluate evidence on a motion for summary judgment, the Court may make a determination as to the "caliber or quantity" of evidence as part of its determination of whether sufficient evidence exists for the fact-finder to find for the non-moving party. *Anderson,* 477 U.S. at 254.

## III.    Analysis

### A.    Race Discrimination

The Board contends that Prescott's claim of racial discrimination should be dismissed because he fails to state a *prima facie* case of discrimination and the Board had a legitimate non-discriminatory reason for discharging him. The Board acknowledges that Prescott is (1) a member of a protected class (2) was qualified for the position and (3) suffered an adverse employment action. Where the parties disagree is on the fourth element required to establish a racial discrimination claim, which is that similarly situated people outside of the protected class were treated differently.

Prescott contends that he has established each element of his race discrimination claim. Specifically as to the fourth element, Prescott contends that he satisfies this element as well. He contends that he was treated less favorably than "African American employees" because the university failed to investigate his allegations of insubordination, violations of company policy and the unprofessional conduct of Angela Jones, the African American female.

Title VII has proscribed "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power* Co., 401 U.S. 424, 431, 91 S. Ct. 849, 853 (1971). If whereas here, a plaintiff cannot establish discrimination with direct evidence, then a plaintiff must proceed under the indirect, burden-shifting method of proof established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817 (1973). The *McDonnell Douglas* pretext analysis places the initial burden on the plaintiff to establish a *prima facie* case of discrimination. *Olsen v. Marshall & Ilsley Corp.,* 267 F.3d 597, 600 (7th Cir. 2001). To state a claim for race discrimination, a plaintiff initially must demonstrate: (1) he is a member of a protected class; (2) he performed his job satisfactorily and was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group. *See McDonnell–Douglas,* 411 U.S. at 802.

Only if a plaintiff successfully produces evidence of a *prima facie* case does the burden then shift to the employer to articulate a legitimate, non-discriminatory reason for the employment action. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S. Ct. 2742 (1993); s*ee also Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ. ex rel. Univ. of S. Fla.,* 342 F.3d 1281, 1289 (11th Cir. 2003). However, "[t]he methods of presenting a prima

facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1092 (11th Cir. 2004) (finding that a plaintiff's discrimination claim is not doomed simply because there is not a similarly situated employee who may be used as a comparator).

In this case, Prescott alleges that the "similarly situated employee" who is not a member of his class is Angela Jones and that she was treated more favorably even though she was his subordinate. In a broad reading of Prescott's claim he is alleging that because he and Jones were both police officers, they both were entitled to notice of any investigation. While she was given notice of his complaint against her, he was not given notice of the university's investigation of him which resulted in his termination.

Generally, a valid comparator is one who holds a similar position and reports to the same supervisor. *Bobo v. United Parcel Service, Inc.,* 665 F.3d 741, 114 (6th Cir. 2012); *see also Santillana v. Florida Stae Court System*, 450 F. App'x 840 (11th Cir. 2012). Prescott does not remotely suggest that he and Jones were functionally equal in terms of job duties. In fact Jones was required to report to Prescott and Prescott was required to report to Dr. Yates.

 Even if he had suggested that they were functionally equivalent, they were engaged in different misconduct. Jones was allegedly insubordinate to Prescott and also allegedly filed false claims against him. Prescott is alleged to have mismanaged his office and to have tacitly or directly allowed his long term administrative assistant to commit payroll fraud through his lack of supervision and despite an earlier warning by Dr. Yates. Jones therefore was not sufficiently similar to Prescott to be used as a comparator. Therefore, unless Prescott can show that he was replaced by someone outside the protected group, his race discrimination claim fails.

However, Prescott does not suggest that he was replaced by someone outside of the protected group. To the contrary, the evidence shows that after Prescott's discharge, he was replaced by Carmen Bray, a white male, who served as Interim Director of the Police Department. *Id.* at 6. Harold Todd, also a white male, was the permanent replacement for the position of Director of the Police Department. *Id.* As a result, Prescott's claim of race discrimination fails because he was not able to present a *prima facie* case of discrimination based on his race, white.

## B.     <u>Retaliation</u>

Prescott alleges that the Board retaliated against him for filing a complaint against Jones for her outrageous behavior and accusations against him. *See* R. Doc. 2, p. 6. Prescott alleges that he filed the complaint on July 13, 2012 and four days later on July 17, 2012 he was given the option to resign or be terminated. *Id.* Prescott alleges that he attempted to file another complaint on July 23, 2012, but the university refused to accept it. *Id.* Furthermore, Prescott claims that the Board's refusal to rehire him is tainted with retaliatory animus. *See* R. Doc. 30-2, p. 24.

The Board contends that Prescott's claims of retaliation fails because he is not able to establish that the only credible reason for discharging him was because they retaliated against him for complaining that he was the victim of racial discrimination. The Board contends that its decision to terminate Prescott was a result of his poor management of Rogers who committed payroll fraud. The Board contends this reason is a clearly legitimate, nondiscriminatory reason for his discharge and that it is not pre-textual.

A plaintiff establishes a prima facie case of retaliation by showing: (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) there was a causal link

between the protected activity and the adverse employment action. *Hernandez v. Yellow Transp., Inc*., 670 F.3d 644, 651-652 (5th Cir. 2012) (citing *Taylor v. United Parcel Serv., Inc.,* 554 F.3d 510, 523 (5th Cir. 2008)).

Once the plaintiff makes a prima facie case, the burden then shifts to the defendant to demonstrate a legitimate, nondiscriminatory purpose for the employment action. *Pineda v. United Parcel Ser., Inc.,* 360 F.3d 483, 486–87 (5th Cir. 2004). If the defendant meets this burden, the burden shifts back to the plaintiff, who must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose. In retaliation cases in the Fifth Circuit, where the defendant has proffered a nondiscriminatory purpose for the adverse employment action, the plaintiff must show that "but for" the discriminatory purpose, he would not have been terminated. *Pineda,* 360 F.3d at 486–87

The Board does not contest that Prescott meets the *prima facie* case required to state a claim for retaliation, it does however suggest that it had a legitimate business reason for terminating Prescott such that his retaliation claim fails. The Court notes that Prescott seems to assert two claims for retaliation. First, he alleges that he was retaliated against for complaining about being discriminated against and being subjected to a hostile environment.  Second, he complains about being denied the opportunity for re-employment.

The Board contends that it had a legitimate, non-discriminatory reason for his termination and for its decision to not re-hire Prescott. According to the Board, Prescott failed to supervise his long term administrative assistant despite having been warned some years earlier that she tended to overbill on overtime hours in violation of the university's policy.

### 1. Termination Reason

Under the burden-shifting analysis, Prescott contends that the reason for his termination was pre-textual. Even if the plaintiff has established the causal link required to make out a *prima facie* case, where the defendants have offered a legitimate, nondiscriminatory reason for the adverse action, the plaintiff "must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Feist v. La., Dept. of Justice, Office of the Atty. Gen.,* 730 F. 3d 450, 454–55 (5th Cir. 2013); *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* ___ U.S. ___, 133 S. Ct. 2517, 2534 (2013). "Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996).

Prescott suggests that the "cat's paw theory" applies to the matter as President Dr. Crain followed the biased recommendation of Dr. Yates who conspired with Jones to discriminate against him. Under the "cat's paw theory" of liability in Title VII race discrimination cases, causation may be established if the plaintiff shows that the decision maker followed a biased recommendation without independently investigating the complaint against the employee. *See Staub v. Proctor Hosp.*, ____U.S._____, 131 S.Ct.1186, 1994 (2011) ("We therefore hold that if a supervisor performs an act motivated by [prohibited] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable."); *see also Lawson v. KFH Indus., Inc.*, 767 F. Supp. 2d 1233, 1245 (M.D. Ala. 2011). In this way, the recommender uses the decision maker as a mere conduit, or cat's paw, to give effect to the recommender's discriminatory animus. *Id.*

In this case, the evidence shows that Dr. Crain testified that Prescott was fired due to a failure of management in his unit that resulted in payroll fraud by his long serving and trusted administrative assistant, Brandi Rogers. *See* R. Doc. 30-21 (Crain Dep., 35:18-21, July 29, 2014). Dr. Crain denied solely making the decision to terminate Prescott and confirmed that he conferred with Dr. Yates. *Id.* at 35:21-24. Dr. Crain further acknowledged that recommendations by the administration are generally accepted by the Board and that he could not recall an instance in which a personnel recommendation was separately investigated by the Board. *Id.* at 24:8-20.

 Prescott contends that at the time of his discharge he was told that the Board wanted to go in a different direction. *See* R. Doc. 30-13, p. 41. The Human Resources Director, Kevin Brady stated that he did not know the real reason Prescott was terminated although he was one of only three people who had the authority to discipline classified employees. *See* R. Doc. 30-20 (Brady Dep. 37:23-25, July 30, 2014).

 In contrast, Dr. Yates testified that when he spoke with Human Resources and they indicated that they gave Prescott the opportunity to resign because "payroll records were involved and the university was defrauded out of about $36,000." *See* R. Doc. 30-19 (Yates Dep. 44:7-17, March 31, 2014). Dr. Yates testified that he believed that Prescott allowed the funds to be stolen by his administrative assistant on purpose. *Id.* (Yates Dep. 44:20-25, March 31, 2014). He provided no further explanation for why he reached that conclusion.

 Additionally, the evidence suggests that it was Dr. Yates who directed his administrative assistant, Rebecca Johnson, following the audit in 2009 to check the overtime hours claimed by employees of the Police Department. *See* R. Doc. 30-3. It is important to note that in May 2012 when Johnson conducted her periodic check, it was during the height of the discord between

Jones and Prescott, and after the receipt of the email from Jones' alter ego Templeton accusing Prescott and Rogers.

Thus, Brady who had the authority to terminate Prescott, did not know why he was terminated and Dr. Crain relied upon advice from Dr. Yates in his decision to terminate Prescott. Despite the facts as delineated above, the Court cannot say that but for Prescott filing a complaint of discrimination against Jones, he would not have been terminated for failing to manage his long term trusted administrative assistant who committed payroll fraud for the second time while under his supervision. Reliance on the payroll fraud audit results as the grounds for termination does not equate to retaliation where Prescott was advised in 2009 to remove Rogers from handling the payroll. Therefore, the request for summary judgment dismissal of the retaliation claim for termination is granted.

## 2. Failure to Rehire

Under the burden-shifting analysis, Prescott contends that the failure to re-hire him is in fact pre-textual because he did not apply for the Director's position but instead applied for a Police Officer 2 position. As a Police Officer 2 he would not have had any subordinates and would not have had to manage personnel. In contrast, he would only have had to use his police officer skills which he has done successfully during his career. Prescott therefore suggests that the Board has inferentially demonstrated retaliatory animus.

"Where the alleged discrimination resulted in a failure to rehire, a *prima facie* case requires the plaintiff to show that: (1) [he] is a member of a protected class; (2) [he] sought and was qualified for an available employment position; (3) [he] was rejected for that position; and (4) the employer continued to seek applicants with the plaintiff's qualifications." *McCullough v.*

*Houston Cty. Tex.,* 297 F. App'x 282, 286 (5th Cir. 2008) (quoting *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 448 (5th Cir. 1996)). There is no question that Prescott was qualified for the Police Officer 2 position, the parties do not dispute that he applied for the position, was rejected and the employer continued to seek applicants.

The few cases that address rehiring issues deal with instances in which the employee was *not* terminated for cause. *See, e.g., McCullough,* 297 F. App'x at 286 (involving a plaintiff who quit her job when the new D.A. took office and argued that the new D.A. failed to rehire her); *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1146 (5th Cir. 1981) (involving a plaintiff that was not rehired after being laid off because of the seasonal nature of the seed business); *Brown v. Transit Mgmt. of Se. La., Inc.,* No. 10–2620, 2011 WL 5119017 (E.D. La. Oct. 27, 2011) (involving a plaintiff who was not rehired after being laid off because Hurricane Katrina destroyed the city's buses).

However, viewing the evidence of the failure to rehire in the light most favorable to the plaintiff, the Court finds that he has presented sufficient evidence that the decision to not re-hire him is pre-textual. The only reason Dr. Crain gave for not rehiring Prescott is that he was terminated for failure to manage his subordinate. Yet Prescott was twice granted an interview for the Police Officer 2 position and on two other occasions was removed from the applicant list for consideration. The Police Officer 2 position is not a managerial position like Prescott's previous position as Director of the Police Department.

Thus, Prescott's claim of retaliation for failure to re-hire survives as there is a question of material fact. Further, the university does not have a written policy forbidding the reemployment of employees terminated for cause. *See Carter v. TCI Media Services*, No. CA 3:97-CA-1096-R,

1998 WL 686777, at *8 (N.D. Tex. Sept. 29, 1998) (finding the employer had a legitimate reason to not rehire the plaintiff because they had a company policy against rehiring employees terminated for cause). Moreover, Dr. Yates testified that everybody is eligible to be reemployed but maybe they did not want to rehire him due to his management lapse. *See* R. Doc. 30-19 (Yates Dep. 43: 20-23, March 23, 2014). In considering the evidence, the Court finds that there is a material question of fact as to why Prescott was not rehired.

C.      **Hostile Environment Claim**

The Board also seeks the dismissal of Prescott's hostile environment claim. It contends that his claim does not meet the high standard for hostility required to prove his Title VII claim of racial harassment. The Board argues that Jones had no authority to discharge or demote Prescott or to otherwise determine his working condition and that she made no threats to his physical safety. *See* R. Doc. 21-1. The Board contends that the essence of Prescott's hostile work environment claim was Jones' use of the administrative process for filing grievances and an EEOC charge against him which converted the environment to a hostile work place. *Id* at 21. The Board contends that Prescott's claim fails because he cannot prove that her complaints, which were administrative in nature, affected a term, condition, or privilege of his employment. The Board contends that Jones remained employed after Prescott was discharge for reasons completely unrelated to either his conduct toward Jones or her conduct toward him. *Id.* at. 21.

Prescott contends that he suffered for months and that his experiences were humiliating and physically intimidating at the hands of his subordinate Jones, which he contends Dr. Yates had knowledge of. *See* R. Doc. 30-2, p. 11. Prescott contends that Jones repeatedly filed baseless claims of discrimination, that she berated him and her other white supervisors almost daily, and

that she failed to follow instructions. Prescott contends that the baseless claims of discrimination Jones filed against him caused the university's representatives to question his decision-making authority and question his authority. *Id.* at. 17.

Title VII is violated when a workplace is so permeated with discriminatory intimidation, ridicule, and insult that is severe or pervasive enough to alter the conditions of the victim's employment and create an abusive working environment. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S. Ct. 998 (1998). Title VII comes into play before the harassing conduct leads to clinical mental illness because: (1) a discriminatorily abusive work environment, even one that does not seriously affect an employee's psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers; and (2) even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S. Ct. 367 (1993).

To assert a hostile environment claim, the plaintiff must plead facts that would tend to show that the complained of conduct (1) is objectively severe or pervasive, that is, the conduct creates an environment that a reasonable person would find hostile or abusive, (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive, and (3) creates such an environment because of the plaintiff's sex or because of another characteristic protected by Title VII. Generally, an employer with the ability to control its subordinates' conduct will be held directly liable for acts done pursuant to illegal practices when the employer had notice of the

illegal practices but chose to do nothing about it. *See U.S. v. City of Yonkers*, 96 F.3d 600, 613–14 (2d Cir. 1996).

"An employer may be held liable for harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *See Curry v. District of Columbia*, 195 F. 3d 654, 659 (D.C. Cir. 1999). In *Lyles v. District of Columbia*, 2014 WL 644977 (D.D.C. 2014), a subordinate, like Jones, was accused of harassing a supervisor. The court found that in the context subordinate-to-supervisor harassment, the employer may be held liable for the harassment of a supervisor by a subordinate if the employer knew or should have known of the harassment and failed to implement prompt and appropriate action; but an employer would not be liable for the harassment of a supervisor by a subordinate-harasser, where the supervisor had the ability to remove or reprimand the subordinate-harasser.

Neither the Supreme Court nor the Fifth Circuit has had the occasion to decide whether an employer can be vicariously liable when a subordinate employee harasses his or her supervisor. *See, e.g., Parada v. Great Plains Intern. Of Sioux City, Inc.,* 483 F. Supp. 2d 777, 796 n.6 (N.D. Iowa 2007) (explaining in dicta that the court cannot conclude that an alleged harasser's status dictates whether they can engage in actionable harassment); *Mingo v. Roadway Express, Inc.,* 135 F. Supp. 2d 884, 891, 898 (N.D. Ill. 2001) ( noting that the plaintiff, a female supervisor, "never reprimanded, counseled or disciplined any of the dock workers whom she supervised for their offensive comments," but ultimately finding that there was a genuine issue of material fact as to whether her employer had notice of her sexual harassment allegations and failed to do something about it); *Lewis v. Sugar Creek Stores, Inc.*, No. 96-CV-0100E(H), 1996

WL 685730, at *2 ( W.D. N.Y. Nov. 25, 1996) ( stating that it is not true that as "as a matter of law, an employee cannot bring a hostile environment claim where the conduct that created the hostile environment was committed by the employee's subordinate(s)" and that it makes a difference at the summary judgment state, whether the supervisor-plaintiff had the authority to stop the harassment by her subordinate and failed to do so).

In considering Prescott's claim, the Court finds that it is true that Jones was more than difficult to manage, but there is no testimony by Prescott that due to having to deal with her false statements about him that he was not able to perform his job or meet the legitimate employment expectations of the university. *Hatchett v. Shinseki*, 957 F. Supp. 2d 960 (S.D. Ind. 2013).

Regardless, the evidence shows that it is reasonable to conclude that Jones' harassment of Prescott led to his termination. The record shows that on April 7, 2012, Angela Jones under the alter ego of Mimi Templeton emailed Dr. Crain and cc'd Dr. Yates advising them that Prescott's administrative assistant not only stole $16,000 from an employee's bank account, but did so while at work and using a university computer and that Prescott knew and refused to take action. *See* R. Doc. 21-3 (Prescott Dep. 137:1-21); R. Doc. 30-10, p. 39 (email from Mimi Templeton).

Thereafter on May 8, 2012, Prescott was called to Dr. Yates' office and he noticed a folder with the names Rogers and Gomez and with numbers that appeared to be hours submitted for work allegedly performed. During Prescott's meeting with Dr. Yates, Dr. Yates inquired of the overtime hours and noted that they appeared to be abundant. Prescott responded that he would have to conduct his own investigation because he didn't know off the top of his head whether they were for hours actually worked or were fictitious. Dr. Yates advised Prescott that he became aware of the overtime hours because his assistant Rebecca Johnson conducted a

review of the payroll and noticed the disparity. *See* R. Doc. 21-3 (Prescott Dep. 153:23-25; 154:1-16). He did not indicate that Jones was in fact the original source of his information.

The next day, Angela Jones filed a grievance against Prescott complaining that since she was hired for the position he had harassed her, wrote her up, investigated her and yelled at her in front of students. *Id.* at 154:18-25. According to Prescott, Jones filed the same complaint, not only with Human Resources, but with the Safety and Health Departments. *Id.* at 155:1-15. Prescott learning about her complaints requested an investigation of Jones' grievances, but on May 9, 2012 the internal auditor began an investigation of three years of paper work that Rogers submitted for payment. On June 4, 2012, Rogers learned of the investigation and resigned her position as Administrative Supervisor 2. On July 6, 2012, Jones emailed Prescott acknowledging that she was Mimi and that she reported Rogers's theft and that Prescott was allowing Rogers to steal time and money from the university. *See* R. Doc. 30-13, p. 16. Eleven days later Prescott was terminated.

It is reasonable to conclude that as of April 7, 2012, when the email was sent to Dr. Crain and Dr. Yates from Jones' alter ego, that Dr. Yates' eyes were then set on Prescott and not just Rogers because the letter clearly accuses him of participating in Rogers' fraud. Further Dr. Yates testified that he believed that Prescott allowed this to occur on purpose.

Considering the evidence of record and the clear contempt that Jones had for Prescott coupled with the inaction of the administration regarding Prescott's complaint of Jones' insubordination, the Court finds that there are questions of material fact of Prescott's claim of hostile work environment, therefore the request to dismiss the hostile work environment is denied.

**IV.    Conclusion**

**IT IS ORDERED** that Defendant, Board of Supervisors of the University of Louisiana System ("Defendant") **Motion for Summary Judgment (R. Doc. 21)** is **GRANTED in Part and DENIED in part.**

**IT IS GRANTED** as to the plaintiff's race discrimination claim and retaliation claim based on Prescott's claim of reverse discrimination.

**IT IS FURTHER DENIED** as to the plaintiff's retaliation re-hire claim and hostile work environment claim.

New Orleans, Louisiana, this 26th day of September 2014

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**